**SAVON GAS STATIONS NUMBER SIX, INC., and A. & H. Transportation, Inc., Appellants,**

v.

**SHELL OIL COMPANY, Appellee.**

No. 8626.

United States Court of Appeals Fourth Circuit.

Argued May 29, 1962.

Decided Sept. 24, 1962.

Lawrence I. Weisman, and David M. Blum, Baltimore, Md. (Nyburg, Goldman & Walter, Baltimore, Md., on the brief), for appellants.

William Simon, Washington, D. C. (John Bodner, Jr., Washington, D. C., S. R. Vandivort, San Francisco, Cal., and Howrey, Simon, Baker & Murchison, Washington, D. C., on the brief), for appellee.

Before SOPER, HAYNSWORTH and BRYAN, Circuit Judges.

SOPER, Circuit Judge.

This suit was brought by two affiliated Maryland corporations, Savon Gas Stations No. 6, Inc., and A. and H. Transportation, Inc., which are engaged in the business of buying and transporting refined petroleum products and selling them at retail at filling stations in the Baltimore area. The defendant is the Shell Oil Company, a Delaware corporation, which is engaged in the production and marketing of petroleum products on an international scale, and also in the retail sale of such products in filling stations in Baltimore.

The gist of the complaint is that Shell on October 13, 1954, in the course of its business entered into an illegal contract in unreasonable restraint of trade with the owners of Middlesex Shopping Center, one of the larger retail shopping centers in the Baltimore area. The Shopping Center is situated on a triangular tract of land in Baltimore bounded by Eastern Boulevard, Essex Avenue and Marlyn Avenue. Under the agreement Middlesex erected a filling station for Shell on property owned by it fronting on the Boulevard, adjacent to the Shopping Center, and leased it to Shell under a covenant that during the term of the lease Middlesex would not use or permit the use of its other property in the triangular area for the purpose of a gas station which would compete with the business being conducted by Shell on the leased premises.

It is charged that the plaintiffs were injured through the enforcement of this covenant two years later when, on August 31, 1956, they opened a filling station on property owned by them fronting on the Boulevard adjacent to the Shopping Center on the side opposite to the Shell Station, and engaged in the sale of gasoline at prices lower than those charged by Shell. The Savon Station was so constructed as to receive traffic from the Boulevard and also to permit the flow of traffic between the rear of the station and the parking area of the Shopping Center without using the street; and the owners of the respective properties entered into an agreement to avail themselves of this situation. Under this agreement the customers of the Shopping Center could cross the station to gain access to the street and the customers of

the station could have direct access to the parking area of the Shopping Center. This arrangement increased the sales at the Savon Station but it was terminated when Shell invoked the restrictive covenant in its earlier agreement of lease and induced Middlesex to abandon its agreement with Savon and to erect barriers between the Savon Station and the Shopping Center so as to prevent the free passage of vehicles between the two areas. Savon claims that by reason of this action its sales dropped off substantially and caused the losses, for which it seeks damages in this suit.

The specific charge of illegality is made in the first count of the complaint that the lease agreement between Middlesex and Shell constituted an unreasonable restraint of trade in violation of §§ 1 and 2 of the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1 and 2. Section 1 provides in effect that every contract or conspiracy in restraint of trade or commerce among the several states or with foreign nations is illegal. Section 2 provides that every person who shall monopolize or conspire with any other person to monopolize any part of such trade or commerce shall be guilty of a misdemeanor and be punished by a fine not exceeding $50,000, or imprisonment not exceeding one year, or both.

The second count of the complaint charges that the wrongful and unlawful acts of the defendant, Shell, constitute not only a violation of the anti-trust laws but also an interference with the contractual rights of the plaintiff in violation of the common law of the state of Maryland.

The case was submitted to the District Judge on motion of the defendant for summary judgment or dismissal upon the allegations contained in the complaint and in certain depositions and affidavits of the parties. Finding the facts to be undisputed, he entered judgment for the defendant and dismissed the complaint. He was of the opinion that the restraint of trade involved in enforcement of the covenant in the lease did not occur in interstate commerce and had no substantial effect upon such commerce as asserted in the first paragraph of the complaint; and he also held that the restrictive covenant in the lease was not in violation of the common law of Maryland as alleged in the second count of the complaint.

The undisputed facts bearing upon the business activities of the parties which are set forth in the allegations of the complaint or in the depositions and affidavits considered by the court, are shown in the following recital.

Shell is engaged in interstate commerce on a national and international scale, producing, refining and marketing petroleum products. In the instant case it secured from Middlesex a lease on the gas station adjacent to the Shopping Center under which all other dealers in petroleum products were excluded from other property in the area owned by Middlesex. It pursues this policy elsewhere.

Savon Gas Stations No. 6, Inc., and A. and H. Transportation, Inc., the plaintiff corporations, may be considered as a single unit for our purposes since they are under a common ownership and have the same president. They are engaged in the business of buying and selling petroleum products. The goods are bought for the most part from the Arrow Oil Company, an affiliated corporation with the same president, which buys the goods in Maryland from producers or dealers who in turn import the goods from outside the state. Some of the goods are bought directly from out-of-the-state producers. The plaintiffs own and operate 8 service stations, 6 in Baltimore and 2 in the counties of Maryland. These stations make annual sales of 6,000,000 gallons amounting to $1,500,000. The Savon Station, which the plaintiffs operate adjacent to the Shopping Center has annual sales of 300,000 gallons amounting to $75,000 per year, a monthly average of 25,000 gallons at $6,250. At the commencement of business, the station's sales averaged 29,000–30,000 gallons per month, but after the barrier was erected and direct access to the parking area of the Shopping Center was denied sales dropped to 15,000–20,000 gallons

per month. In each of the five years preceding the trial of the case the station lost approximately $20,000. All of the other stations with the exception of 2 are operated at a profit. In Maryland there are in all from 2500 to 2700 service stations selling between seventy and ninety million gallons of gasoline per month.

The plaintiffs' depositions show that the competitive area for the sale of petroleum products in the neighborhood of the Shopping Center is included in a radius of three blocks from the Center. Within this area there are at least ten service stations in which virtually all of the well-known gasoline brands, including Esso, Socony, Mobil, Tidewater, Texaco, Sun, Crown, Atlantic, Sinclair, as well as Shell and Savon, are sold.

██ The plaintiffs' case is pitched upon the theory that both the Federal Anti-Trust Statutes and the common law of Maryland are violated when the owner of a modern shopping center enters into a restrictive agreement with a lessee giving him the exclusive right to sell his wares in the area. It is well known that the success of a shopping center depends upon the gathering together in one area of a variety of enterprises which are able to serve the needs of the general public and that this end can often be best accomplished by offering to the individual merchant the exclusive right to sell in the center the kind of merchandise he handles.[1] It is said, however, that such an arrangement is illegal and that the owner must be free to let any competitor in so that he can do business with the members of the public who are attracted to the area by the establishment of the center through the joint efforts of the owner and the merchants. The argument does not go so far as to maintain that the owner of the property may not of his own volition select the merchants he desires to associate with and exclude those he deems undesirable to the group. Such an argument would be clearly untenable

since the right to select one's business associates is not denied by law. United States v. Colgate & Co., 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992; United States v. Parke, Davis & Co., 362 U.S. 29, 43, 80 S.Ct. 503, 511, 4 L.Ed.2d 505. Nevertheless, it is said that if substantially the same arrangement is made by a restrictive agreement between the owner and the merchant there arises a conspiracy to impose an unreasonable restraint of trade in violation of the Sherman Anti-Trust Act and a restraint of trade condemned by the ancient theory of the common law, which influenced the framers of the Anti-Trust Acts.

██ We agree with the conclusion of the District Judge that the restrictive covenant did not involve the violation of the Federal Statute. It has been established from the beginning that the condemnation of the Sherman Anti-Trust Act is directed only at such agreements or conspiracies as impose unreasonable or undue restraint upon interstate commerce. Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619; United States v. Trenton Potteries, 273 U.S. 392, 395–396, 47 S.Ct. 377, 378–379, 71 L.Ed. 700; Klor's v. Broadway-Hale Stores, 359 U.S. 207, 211, 79 S.Ct. 705, 708–709, 3 L.Ed.2d 741. In the instant case the restraint cannot be so characterized. The contrast between it and the agreements found to be illegal in the decisions upon which the plaintiffs rest their case demonstrates this conclusion. Since the sale of petroleum products at retail at service stations, considered as an isolated transaction, is local and intrastate in character, the plaintiffs have called our attention to authorities in which it is held that transactions in themselves local and intrastate may be within the purview of the statute if they spring from agreements whose enforcement reaches beyond the state. See Klor's v. Broadway-Hale Stores, 359 U.S. 207, 211, 79 S.Ct. 705,

---

[1]. See Tenant Selection Policies of Regional Shopping Centers, Journal of Marketing, April, 1959; Senate Subcommittee of Committee on Small Business, 86 Congr.,

First Session, April 28–29, 1959; pp. 2–17, 56–67, 71–84; 34 N.Y.U.L.Rev. 940 (1959); 63 Harv.L.Rev. 1400 (1950).

708–709, 3 L.Ed.2d 741; Moore v. Mead's Fine Bread Co., 348 U.S. 115, 75 S.Ct. 148, 99 L.Ed. 145; Mandeville Island Farms, Inc. v. American Crystal Sugar Co., 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328; Osborne v. Sinclair Refining Co., 4 Cir., 286 F.2d 832; American Federation of Tobacco Growers v. Neal, 4 Cir., 183 F.2d 869.

In each of these cases, however, the agreements were obviously designed so to restrict and injure a merchant's business as to be easily recognized as unreasonable and oppressive. In Klor's a combination was entered into between the owner of a chain of department stores and ten manufacturers and distributors of household appliances in interstate commerce in order to deprive the owner of a local household appliance store of the goods he needed in his business by refusing to sell to him; and it was held that this arrangement amounted to a group boycott in violation of §§ 1 and 2 of the Sherman Act, although the needs of the public could be supplied by other retail stores in the plaintiff's neighborhood.

In Moore v. Mead it was held that § 2 of the Clayton Act and § 3 of the Robinson-Patman Act were violated by a combination of manufacturers of bread, engaged in interstate commerce, who conspired to cut prices in one city, where the plaintiff had an intrastate bakery business, but maintained their prices elsewhere in interstate transactions.

In Mandeville it was held that the Sherman Anti-Trust Act was violated by a combination of corporations, who were beet sugar refiners and distributors in interstate commerce, who undertook to fix prices to be paid to intrastate growers of sugar beets.

In American Federation of Tobacco Growers we held that the statute was violated by a combination of tobacco warehousemen whereby a tobacco farmers' cooperative was excluded from the privilege of making sales on the local tobacco market.

In Osborne we held that the Sherman Act was violated when a producer of petroleum products entered into a tie-in arrangement with operators of local service stations whereby they were enabled to purchase petroleum products of the defendant only on condition that they buy accessories from a certain manufacturer.

It is quite obvious that no such meretricious agreement or arrangement was effected by the restrictive covenant in the lease in the pending case. There was no combination to fix prices; no effort to deprive the plaintiff of the necessary supplies for the operation of his business, no interference with his sales of goods to the public, no direct interference with his business in any fashion, and no restraint upon the competitive sale of gasoline in the neighborhood. The single restriction was to deny him direct access from the rear of his property to the parking area of the Shopping Center or, in other words, the right to use the property of the Shopping Center as part of his place of business. The customers of the Shopping Center had free access to the defendant's place of business by using the public street in common with all other members of the traveling public. We do not think that the restriction imposed upon the defendant by the exercise of the right of the Shopping Center to choose the persons who were allowed to do business on its property amounted to an unreasonable restraint of trade within the purview of the Federal Statutes.

We agree also with the District Judge that the restrictive covenant did not violate the common law for the reasons set forth in his opinion. Savon Gas Stations No. 6, Inc. v. Shell Oil Co., D.C., 203 F.Supp. 529. Most pertinent is the decision of the Court of Appeals of Maryland in Maryland Trust Co. v. Tulip Realty Co., 220 Md. 399, 153 A.2d 275, where the validity of a restrictive agreement for the use of the parking area of a shopping center was upheld. The owner of the center had conveyed a part of the property by deed in which it covenanted that the grantee should have the right in common with other tenants in the shopping center to use the parking area for the benefit of itself and its patrons for

ingress and egress and for parking motor vehicles. Subsequently, the stockholders of the grantor formed a new corporation which acquired a tract of land bordering on the parking area of the center, erected a store thereon and leased it to a new tenant with an agreement in which the owner of the shopping center joined to keep the boundary line between the new store and the parking area unobstructed. Upon suit for relief by the grantee in the first mentioned deed it was held that the covenant in the lease to the tenant of the adjoining property was in conflict with the agreement in the deed whereby the tenants of the shopping center acquired the right to use its parking area as described above; and it was further held that the chancellor was correct in requiring the erection of a fence between the parking area and the new store so that the tenant of the new store could not have the use of the parking area. The decision of the Court of Appeals was in harmony with the Maryland rule set out in the cases cited by the District Judge that partial restraints of trade, reasonably limited in time and space, are not in conflict with the common law.

In the Tulip case the Court of Appeals of Maryland expressly applied the rule that restrictive covenants should be strictly construed but, nevertheless, held that the grant to the tenants of the shopping center of the right to use the parking area for the benefit of itself and its patrons should be interpreted as exclusive so as to forbid the use of the parking area by other persons. In the pending case the plaintiff suggests that under the rule of strict construction the restrictive covenant in the deed from Middlesex to Shell should not be interpreted to require Middlesex to deny to Savon direct access to the parking area from the rear of its gas station but merely to forbid Middlesex to permit any person other than Shell the use of the property for the purpose of a competing gas station, and it is said that Savon did not propose to make such use of the parking area in this case. There is no substance in the suggestion. Savon sought an easement of access over the parking area so that it became in effect an extension of the area of the service station itself. The reasons which led the Court of Appeals of Maryland to interpret the covenant in the Tulip case as conferring exclusive use upon the grantee, and denying it to other persons, are equally applicable here.

Affirmed.